CANFIELD v. MINNEAPOLIS AGRICULTURAL & MECHANICAL ASSOCIATION and others.*

(*Circuit Court, D. Minnesota.*   January 20, 1883.)

**1. CORPORATION—STOCK—PLEDGED AS COLLATERAL—SALE OF.**
When stock is pledged as collateral security by delivery of the certificates with blank transfer on the back, signed by the owner, and the principal indebtedness is past due, the pledgee can sell the stock as the readiest mode of collection, giving the pledgeor and his successor in interest reasonable notice to redeem, and of the time and place of sale.

**2. SAME—ABSOLUTE OWNERSHIP—HOW ACQUIRED.**
The pledgee, a bank, improperly purchased the pledge through an agent. *Held,* that nothing passed by such form of sale, and the bank still holds the pledge by its original title as collateral security, and only a *bona fide* purchaser from the bank could subsequently acquire absolute ownership of the stock.

**3. SAME—RECOVERY OF LAND REPRESENTED BY THE STOCK.**
When the pledge is stock of an association, having no other corporate property than real estate, *held,* that the complainant, who had succeeded to all the rights of the original pledgeor, could recover the land by a suit in equity, on reimbursing the grantees, who obtained their title with notice of his rights and equities, the amount they are actually out of pocket.

**4. SAME—ACCOUNTING OF RENTS, PROFITS, AND INCOME.**
To arrive at such sum an account must be had of rents, profits, and income received by such grantees while in possession of the real estate.

In Equity.

The complainant, a citizen of Vermont, in 1877 brought this suit in equity against the defendants, citizens of Minnesota, and in November, 1880, an amended and supplemental bill was filed, praying the court to confirm the title in him to certain shares of stock of the defendant association, and also the title to all the land which the stock represented, except five acres, and issue was joined.

The facts found are these:

In June, 1871, the defendant, the Minneapolis Agricultural & Mechanical Association, was organized under the laws of the state of Minnesota as a body corporate, and its chief business was the holding of fairs and other public exhibitions. The capital stock was $40,000, divided into 800 shares, of $50 each, and the corporation subsequently acquired the title to 70 acres of land situated in the county of Hennepin, in this district, described as follows, to-wit, the N. W. $\frac{1}{4}$ of the N. E. $\frac{1}{4}$ of section 36, in township 29, of range 24, and the W. $\frac{3}{4}$ of the N. E. $\frac{1}{4}$ of the same section.

Previous to August, 1873, five acres of this tract had been transferred to the Minneapolis Harvester Works, for which no claim is asserted. The association held no corporate property other than the real estate above men-

*See 7 Sup. Ct. Rep. 887.

tioned, and prior to April, 1873, William S. King had become the owner of the 800 shares representing the entire capital stock.

On November 5, 1872, King purchased 200 shares of this stock from George A. Brackett, and gave his notes in the sum of $14,000, due one year from date, for the purchase money, and Brackett retained the stock in pledge for payment. On November 12 of the same year King also purchased from R. J. Mendenhall 100 shares of the stock for $6,250, giving his notes for the purchase money, and this stock was held in pledge for their payment. In September, 1873, Brackett borrowed, on his note, $10,000 from the State National Bank of Minneapolis, and turned over as collateral security the King notes for $14,000, and repledged the stock accompanying them, and about this time the bank also took from Mendenhall the King notes for $6,250, and the 100 shares of stock pledged therewith. The pledge of the stock, in all instances, was made by a delivery of the same with blank transfer indorsed on the certificates, signed by the party to whom they were issued. King's title to the 800 shares of stock was obtained by such delivery to him, and no transfer was made upon the books of the corporation.

On July 19, 1873, King pledged the remaining 500 shares to R. J. Baldwin, at that time cashier of the said State National Bank, to secure him personally for the return of $10,000 gas stock then loaned by him to King, and King also authorized Baldwin to hold these shares as further security for his notes to Mendenhall and Brackett, then held by the bank. The transfer of this stock was also made by delivery of the certificates as above mentioned.

On August 14, 1873, the complainant in good faith, without notice of the stock being pledged, purchased of King the real estate above described, being all the corporate property of the association, and the following agreement in writing was executed:

"I will sell to Thomas Canfield the property known as the fair grounds, in Minneapolis, (excepting five acres subscribed to the stock of the Minneapolis Harvester Company) for the sum of $65,000. I will receive in payment therefor $65,000 of the 7.30 gold bonds of the Northern Pacific Railroad Company, at the rate of 90 cents on the dollar, and the balance in the notes of hand of the said Canfield, payable in equal installments one, two, and three years from date, with interest at the rate of 10 per cent. per annum. In case the said Canfield shall, at the end of one year from date, prefer to have said notes surrendered, and in lieu thereof allow me one-half the profits from the sale of said property, after paying back to said Canfield the sum of $59,500, together with interest upon the same at 10 per cent. per annum, and all taxes and expenses incurred in improving and managing the property, then I am to surrender said notes, without interest. This proposition is based upon the supposition that there are 70 acres in said tract before deducting the five acres before mentioned. In case there is not so much the consideration to be in proportion. I am to procure abstract of title and perfect the same, and execute a warranty deed at as early a day as possible. All buildings and other materials to go with the land except the building sold to the harvester company.

"August 14, 1873.                                    W. S. KING.

"I accept the above proposition and will pay as provided in the foregoing agreement when the proper deed is delivered.

"August 14, 1873.                            THOMAS H. CANFIELD."

King, without informing the complainant that this stock was pledged, verbally agreed to transfer the stock to complainant and procure a deed to him from the association. In order to carry out his agreement, King procured a deed to be executed by the several directors, in form, one of bargain and sale, purporting to be a conveyance of the real estate by the association to the complainant. This deed is signed as follows:

" THE MINNEAPOLIS AGRICULTURAL & MECHANICAL ASSOCIATION. [Seal.]
                      "By " [Director's signatures.]

Among those signing as directors are the defendants Dorilus Morrison and George A. Brackett.

The sale of the property was not authorized at any meeting of the board of directors, nor was the deed directed to be executed, or the corporate seal authorized to be attached thereto, at any meeting of said board; and this conveyance was declared void and of no effect as against the bank by the supreme court of the state of Minnesota in a suit between it and complainant.

On September 12, 1873, at the city of New York, King delivered to Canfield this deed, together with a warranty deed of the same property executed by himself, and an abstract of title, but did not transfer any of the said 800 shares of stock. At the same time complainant delivered to King $65,000 in Northern Pacific bonds, and further complied on his part with the terms of the agreement. These deeds were duly recorded October 4, 1873.

On July 16, 1877, no part of the King notes to Brackett and Mendenhall had been paid except two years' interest on the Mendenhall notes and on Brackett's note, which was then past due—$7,000.

The gas stock had then been returned, and the bank held all the 800 shares of stock pledged for the payment of the King notes and the balance due upon Brackett's note. The bank's claim being $13,000, it proceeded to sell the 800 shares pledged, and gave public notice of the time and place of sale, and also served personal notice on King and the complainant. After several adjournments, the entire 800 shares were offered by the auctioneer and struck off and sold to one James M. Knight, on his bid of $13,000, which was made and the amount of the bid paid as follows: The State National Bank was in process of liquidation, and the King and Brackett notes, among others, had been placed in the control of Baldwin, who had retired as cashier, but was still a stockholder and had the charge of the sale of the pledged stock. Baldwin, just before the sale, informed Harrison, the president of the bank, that it was necessary to have some one bid to the amount of the bank's claim, $13,000, and gave him a memorandum of the computation. Harrison immediately requested his son-in-law, Knight, to attend the sale and bid that amount. Knight had no money, and so informed Harrison, but the latter told him that he could give his check on the State National Bank for the amount, and when Knight said " The bank will not take the check," he replied, " Perhaps it will if I indorse it." Knight paid no money at the time, and the check never was returned to him, nor did the stock pass from the control of Baldwin.

It is not clear that Harrison's check was charged up against him, although he was the largest stockholder and had some $80,000 on deposit; but the amount of the check was subsequently paid as hereafter stated. Shortly

afterwards, Morrison gave his notes to Knight for the aggregate amount of $12,430.42, and nine-tenths of the 800 shares of stock were, by a written agreement, transferred to him. Baldwin drafted the agreement and had charge of the shares of stock at that time, and arranged the manner in which Knight's one-tenth interest should be noted on the stock, signing Knight's name (per Baldwin) upon one of the certificates, by which his interest therein could be ascertained. The Morrison notes were given Baldwin, who took them in part payment of Knight's check, leaving a balance still due.

After this transaction a meeting of stockholders of the association was held and new directors were elected who resolved to sell and to deed the corporate property to Morrison and Knight, and on February 23, 1878, the association made, executed, and delivered a deed of an undivided nine-tenths of said lands to Morrison, and one-tenth of the same to Knight. Morrison knew, when the agreement of sale for the stock was entered into, all about the transaction between King and complainant, and had executed, as director, a conveyance purporting to be a deed of the corporation to perfect the title. He also agreed to pay the expenses incurred by the bank and Baldwin in a litigation between them and the complainant about the stock and the land, which were not a lien on the stock, and for the payment of which Knight was not liable. The Morrison notes were held by the bank, and not paid except as stated hereafter.

A fair was held on these grounds in 1878, which proved a financial failure, and, on an appeal to the citizens of Minneapolis, $30,000 was raised to pay up the deficiency and relieve the real estate from Morrison's claim. Out of this fund the Morrison notes were paid, partly in cash and partly in individual notes, among which was Morrison's for $3,000, the amount of his subscription.

It was the understanding between the citizens who subscribed and Morrison that his interest in the land was only an incumbrance upon nine-tenths thereof, and he conveyed such interest to Sidle and Langdon, October 22, 1878, who declared a trust to most of the subscribers to the fund. Sidle and Langdon knew of the complainant's equity and the pending litigation, and that Morrison's interest was regarded by him as an incumbrance only. King, the original pledgeor of the stock, had possession of the real estate for the purpose of holding fairs and exhibitions for the years 1877, 1878, 1879, and 1880.

*E. C. Palmer* and *Chas. E. Flandrau,* for plaintiff.

*Wilson & Lawrence* and *Morrison & Van Norman,* for defendants.

NELSON, D. J. Upon the facts, as I understand them, the question presented is not difficult of solution, although the transactions are somewhat complicated. The State National Bank, on July 16, 1877, held as collateral security for the payment of King's notes the 800 shares of stock which represented the entire corporate property of the Minneapolis Agricultural & Mechanical Association, comprising 70 acres of land, and had a right to sell the pledged stock, all the notes being past due and unpaid. It proceeded to give reasonable and proper public notice of the time and place of sale, and specially notified the pledgeor and the complainant, who had succeeded to all his

interest therein. At the sale the stock was struck off to Knight, the son-in-law of the president of the bank, who had been requested to bid the amount of the bank's lien—$13,000. It is very clear this bid was for the benefit of the bank, and was so regarded by the president and its agent, Baldwin. The conduct of Baldwin in subsequent transfers of the stock after the sale can be accounted for in no other satisfactory manner. He drew the agreement of sale to Morrison of nine-tenths of the stock, providing for the payment of the expenses of certain litigation incurred by the bank and himself, for which Knight was not liable, and by *memoranda* upon one of the certificates designated the number of shares therein reserved under the sale to Morrison, signing thereto Knight's name, which indicates that he had not parted with the control of the stock.

There is no clear and certain testimony that Knight ever had anything to do with the pledged stock or the corporate property, except in connection with Baldwin, who represented the bank. Knight testifies that "Harrison or Baldwin delivered the stock to him at his store about the time he purchased." Harrison says: "I don't know to whom the stock was delivered after it was bid off. Baldwin attended to these matters as agent of the bank." "He (Knight) never paid any money to me on account of that bid. I don't know what he did outside of that." Baldwin says: "I had nothing to do with the receiving or application of the proceeds of the sale. * * * I made the sale and turned the matter over to the proper officer of the bank." On his subsequent examination it is assumed that he had previously testified that he delivered the stock, and he then states that Knight had the stock for a long time. It is clear, however, that it never passed entirely from Baldwin's control, even if it was in Knight's possession. Knight paid no money at the time of the sale, but gave his check on the bank where he had no deposit, at the request of Harrison, who indorsed it, and this check was accepted by the parties in interest. It is uncontroverted that neither Baldwin, Knight, nor Harrison knew what became of this check. Dean, who was the cashier at the time of the sale, is of the impression that the check was entered upon the books as proceeds of the sale, but it is evident, from an examination of his whole testimony, that he knows nothing certain about it. The conclusion is irresistible that the bank was the purchaser, and it is elementary law that nothing passed by such form of sale and it still held the stock under its original title as collateral security. After the sale Brackett's note was returned to

him, together with King's notes for $14,000, which had been pledged for its payment; but this cannot change the situation. The complainant's right to redeem from the bank or set aside the sale after such form of foreclosure is not doubtful. Has anything subsequently transpired which will prevent him from asserting his equitable right to the corporate property?

2. Dorilus Morrison, who was one of the original directors of the association, purchased, as he says nine-tenths of the stock from Knight. He had previously as such director executed a deed to the complainant, purporting to convey on behalf of the association the corporate property. He knew all about King's sale to complainant, and executed this deed at his instance, in order, if possible, to perfect the title. When the agreement for sale between him and Knight was signed, Baldwin, the agent of the bank, was present, drew up the bill of sale, and managed the transfer and delivery of nine-tenths of the stock, in which Morrison agreed to pay the liability of the bank incurred in litigation about the stock, which was neither a lien nor a condition of sale imposed by Knight. His conduct subsequently in connection with the stock and the corporate property clearly shows that he never regarded his interest any more than a lien for the protection of advances made by him. In fact, he paid no money to Knight, but when the agreement was executed gave his notes for $12,430.42, which Knight turned over to Baldwin, and these notes were subsequently paid out of a fund subscribed by certain citizens of Minneapolis. He was a purchaser with notice, and his right to hold the stock as against the complainant is no better than Knight's or the bank's. The conveyance by the association to Knight and himself of the entire corporate property did not change his relation to the complainant. It virtually dissolved the corporation, but the grantees acquired no right thereto superior to that they before possessed.

3. The trustees, Sidle and Langdon, are not *bona fide* purchasers for value. They knew all about the property—its complications, and the previous and pending litigation. Their desire was to make up the deficiency resulting from the fair of 1878, which was a failure financially, and at all the conferences between citizens who afterwards subscribed to the fund of $30,000 to pay off debts, it was understood that Morrison, who was present and participated in these meetings, only desired that his notes, then outstanding, should be provided for, and that he would deed the property for about $14,000, which was the amount then due thereon. In fact, the representation of King to

Sidle and others of the deficiencies due embraced this item of $14,-000, and the declaration of trust by Sidle and Langdon speaks of incumbrances, which, in my opinion, refers to the Morrison interest.

4. While Sidle and Langdon took the title to the land with notice of the complainant's equity, and could not by a declaration of trust affect it, yet the complainant in my opinion is liable to them for the money actually paid Morrison for his interest, which was $8,646.55, and they must account to him for any income, profits or advantages derived from the use of the property.

My conclusion is that complainant is entitled to a decree in his favor requiring James M. Knight, upon the payment to him of the sum of $569.58, to execute to the complainant a conveyance of one-tenth of the said real estate, and Jacob K. Sidle and Robert B. Langdon to account for the rents, profits, and income of said real estate while in their possession, and to pay over to complainant the excess, if any there be of the same over and above said sum of $8,646.55, and to convey nine-tenths of said real estate to complainant. But in case said sum of $8,646.55 shall exceed such rents, profits, and income, then to execute such conveyance upon the payment of the balance to them by complainant. And that upon the failure of the said Knight to execute such conveyance within 10 days after the payment or tender to him by complainant of said $569.58, that such decree stand as a conveyance. And upon the failure of said Sidle and Langdon to make such accounting within 10 days after the service of notice on them to appear before the master for such purpose, or to execute said deed within 10 days thereafter, or after the payment or tender to them of the excess of said sum of $8,646.55, over said rents, profits, and income, in case there is an excess, that such decree stand as a conveyance from them.

The case will be referred to H. E. Mann, as master, to take the accounting provided for. Let a decree be entered accordingly.